**The STATE of Ohio, Appellee,**

v.

**FRITZ, Appellant.**

[Cite as *State v. Fritz,* 178 Ohio App.3d 65, 2008-Ohio-4389.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 22377.

Decided Aug. 29, 2008.

Mathias H. Heck Jr., Montgomery County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Jon Paul Rion, for appellant.

---

DONOVAN, Judge.

{¶ 1} This matter is before the court on the notice of appeal of Dexter Fritz, filed September 6, 2007. On January 26, 2007, Fritz and another defendant, Latonya E. Messenger, were indicted by a Montgomery County grand jury ("A indictment"). Fritz was indicted as follows: count one, trafficking in drugs (crack cocaine), in an amount less than a gram, in violation of R.C. 2925.03(A)(1); count two, trafficking in drugs (crack cocaine), in an amount greater than one gram but less than five grams, in violation of R.C. 2925.03(A)(1); and count four, engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(3). On July 24, 2007, Fritz was reindicted ("B indictment") as follows: count one, engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1); count two, trafficking in drugs (cocaine), in an amount greater than one gram but less than five grams, in violation of 2925.03(A)(2); count three, trafficking in drugs (crack cocaine) in an amount greater than one gram but less than five grams, in violation of R.C. 2925.03(A)(1); count four, possession of crack cocaine in an amount greater than one gram but less than five grams, in violation of R.C. 2925.03(A)(2); count five, trafficking in drugs (crack cocaine) in an amount less than a gram, in violation of R.C. 2925.03(A)(2); and count six, possession of crack cocaine in an amount less than one gram, in violation of R.C. 2925.11(A).

{¶ 2} Following a jury trial, Fritz was convicted on count one in the A indictment and on all counts in the B indictment. He was sentenced as follows:

Counts two, three, and four in the B indictment: 18 months concurrent with each other;

Count one in the A indictment and Counts five and six in the B indictment: 12 months concurrent with each other; and

Count one in the B indictment: two years concurrent with the sentence for Count one of the A Indictment.

{¶ 3} The sentence for Count 1 of the A indictment was consecutive to the sentences for Counts 2, 3, and 4 of the B indictment, for a total prison term of 30 months.

{¶ 4} The events giving rise to this matter began when Paul Hutsonpillar, a detective with the Perry Township Police Department assigned to the Montgomery County Sheriff's Department's organized-crime unit, became involved in an investigation into drug trafficking led by Detective Thomas Engles of the Kettering Police Department. A confidential informant advised Engles that a black female by the street name of T was selling crack cocaine from apartment 17, at 3217 Wilmington Pike. Engles selected Hutsonpillar to conduct a controlled buy since it was unlikely he would be identified by any suspects as an officer, given that he was from another jurisdiction.

{¶ 5} Hutsonpillar testified that he identified himself as Rob and used the "dropped name" of Barry when he called T, explaining to the jury that a dropped name is a name that the confidential informant knew belonged to someone else who had purchased crack cocaine from T recently. T was actually Latonya Messenger, and Hutsonpillar asked her the price to buy an eight ball of crack cocaine. Messenger quoted a price of $80, and Hutsonpillar obtained the money from Engles. Wearing a wire, Hutsonpillar went to Messenger's apartment at approximately 6:30 p.m. on October 24, 2006. Messenger let Hutsonpillar into the apartment, and once inside he observed a younger white female and an older black male there. Messenger asked Hutsonpillar for $90, and Hutsonpillar replied that he brought the money they had agreed to, $80. Hutsonpillar then sat on a couch while Messenger placed a phone call to "her dude," informing him that Hutsonpillar only had $80. Approximately 10 minutes later, Fritz and another black male arrived at the apartment, and Messenger allowed them to enter. The man accompanying Fritz was his cousin, Adrian. Fritz gave Messenger a baggie of what Hutsonpillar believed was crack cocaine, and in exchange, Messenger gave Fritz the $80 she had obtained from Hutsonpillar. Messenger put the cocaine on a mirror, took a small piece for herself, and put the larger piece into the baggie for Hutsonpillar. Hutsonpillar then left the apartment with the drugs.

{¶ 6} Hutsonpillar testified that he later placed another call to Messenger to purchase more drugs, and on October 26, 2006, he again entered her apartment

with money to purchase crack cocaine. Messenger again placed a phone call, and 20 minutes later, Fritz again appeared at the apartment, this time alone. Fritz removed the crack cocaine from his right jacket pocket, and he gave it to Messenger in exchange for the money. The drugs were not in a baggie. Messenger again took a small "pinch" of the drug for herself and gave the rest to Hutsonpillar, who placed the drugs into the cellophane from his cigarette pack. According to Hutsonpillar, Fritz "got in my face," asking what kind of car Hutsonpillar drove. When he told Fritz he drove a black truck, Fritz did not believe him until Messenger confirmed that the black truck was Hutsonpillar's. Hutsonpillar then left with the drugs and again met with Engles. According to Hutsonpillar, there was never any small talk between Fritz and Messenger; the transactions were "strictly business."

{¶ 7} Fritz asserts four assignments of error. His first assignment of error is as follows:

{¶ 8} "The matter should be remanded for resentencing because the trial court, by castigating appellant for having exercised his right to a jury trial, indicated its bias and therefore denied appellant his constitutional right to a fair trial.

{¶ 9} "It is beyond dispute that 'a defendant is guaranteed the right to a trial and should never be punished for exercising that right.' *State v. O'Dell* (1989), 45 Ohio St.3d 140, 147, 543 N.E.2d 1220. Accordingly, when imposing a sentence, a trial court may not be influenced by the fact that a defendant exercised his right to put the government to its proof rather than pleading guilty. *State v. Scalf* [ (1998), 126 Ohio App.3d 614, 710 N.E.2d 1206]. Moreover, * * * courts have warned against making statements that suggest an intent to punish a defendant for proceeding to trial." *State v. Blanton* (Apr. 12, 2002), Montgomery App. No. 18923, 2002 WL 538869, *2.

{¶ 10} "Any increase in the sentence based upon the defendant's decision to stand on his right to put the government to its proof rather than plead guilty is improper. * * * If courts could punish defendants for exercising their constitutional right to a jury trial, the right would be impaired by the chilling effect. * * * This prohibition on increased punishment applies 'no matter how overwhelming the evidence of [defendant's] guilt.' " (Brackets sic.) *State v. Morris,* 159 Ohio App.3d 775, 2005-Ohio-962, 825 N.E.2d 637, ¶ 12, quoting *United States v. Derrick* (C.A.6, 1975), 519 F.2d 1, 3. In *Morris,* the matter was remanded for resentencing after the trial court created the appearance that it gave defendant an enhanced sentence to punish him for exercising his right to trial; the judge expressed anger that Morris went to trial, noted the personal and financial impact of Morris's decision upon the judge as a taxpayer and county resident, noted the inconvenience Morris caused the jurors who had to hear a "slam dunk

case," ridiculed Morris's decision based on the facts, and finally, in listing the aggravating factors it considered when imposing sentence, noted that Morris pled guilty and "put the State to the test."

{¶ 11} Unlike the Morris case, in *Blanton* we affirmed a sentence, noting any improper inference of a trial tax was dispelled. In *Blanton*, the defendant was convicted of possession of crack cocaine. The sentencing judge noted that Blanton had more than 30 misdemeanors and ten felonies on his record and found that he would not be a good candidate for probation. The judge followed up this explanation with the following statements:

{¶ 12} " 'In addition, you're not amenable to probation because this was a case where you confessed twice to the police. You knew your guilt and yet you want to drag us all through this and make sure that we all got fifty citizens in here that had to try your case and make sure that it would go all right.

{¶ 13} " 'Not that you don't have that right to all that, you do. But it's my understanding you've made statements that you wanted to make sure everybody got to go through the system. You wanted to make sure that everybody got to— we got—you got your dime out of all of us. And * * * that was your revenge on all of us.' " (Emphasis omitted.) *Blanton* at *2.

{¶ 14} The court noted Blanton's lack of remorse and that he committed the offense while on probation. The court weighed the seriousness and recidivism factors, noted that Blanton was not amenable to community-control sanctions, and proceeded to impose the maximum sentence.

{¶ 15} Blanton argued that the sentencing court gave the appearance that it considered Blanton's request for a jury trial for the purpose of enhancing Blanton's sentence. In overruling Blanton's assigned error, we relied upon *Scalf,* in which the Eighth District Court of Appeals had "reviewed primarily federal case law and concluded that a defendant's sentence must be vacated if the record creates an unrebutted inference that his sentence was enhanced because he elected to put the government to its proof. If an inference of sentencing impropriety exists, the *Scalf* court reasoned that an appellate court must 'determine whether the record contains an unequivocal statement as to whether the decision to go to trial was not considered in fashioning the sentence.* * * Absent such an unequivocal statement, the sentence will be reversed and the matter remanded for resentencing.' " *Blanton* at *3.

{¶ 16} We reviewed the trial court's quoted remarks in *Blanton* and determined that they, "standing alone, do support an inference that the judge may have considered Blanton's refusal to plead guilty when denying probation and imposing a term of incarceration." Id. We further determined, however, when read as a whole, the trial court's remarks made clear that it would not have

granted probation, even if Blanton pled guilty, since the trial court noted Blanton's previous record and also found that recidivism was likely. "Notably absent" from the court's later remarks "is any mention of Blanton's decision to proceed to trial." Id. We construed "these statements * * * as an unequivocal explanation of its sentencing decision, sufficient to dispel any inference of impropriety." Id.

{¶ 17} Fritz's sentencing is more akin to that of the *Morris* case, not our decision in *Blanton*.

{¶ 18} The following exchange initially occurred at Fritz's sentencing:

{¶ 19} "THE COURT: Mr. Fritz, anything you'd like to say, sir?

{¶ 20} "THE DEFENDANT: Yes, sir, first of all, thank you for taking the time out of your busy life and schedule to * * *

{¶ 21} "THE COURT: I hope you're ready to write a letter to all those jurors too of thanks. I mean those 50 people who came in here and wasted their days here.

{¶ 22} "THE DEFENDANT: I was going to. I'm at a loss of words. Being locked up has been cause to reassess * * *

{¶ 23} "THE COURT: You haven't even been locked up * * * 50 people came in here, roughly, to sit like a jury, to determine whether you were guilty or innocent.

{¶ 24} "I don't, I couldn't agree more that we need a system that protects the innocent. We have to make sure that we honor that system, but it's not designed to protect the guilty. When it's used by the guilty, it's being abused. When it's used by those that are guilty, then it abused those 50 people, brought them in to prove what? Instead of admitting your wrongdoing, as we gave you ample opportunity to do, nope, you wanted to * * * you wanted to say, no, I'm not guilty, I'm not guilty now, I'm not guilty then, I'm not guilty now, I'm not going to do anything, but say that I'm innocent. And I'll tell you I heard the evidence. And I'm just * * * I'm with the jury on this one. I'm with the jury on it. You just decided to waste 50 people's time. You took a day out of each one of their lives and a couple days out of the 12 of them, 13 of them who had to sit here through this, not to protect the innocent, but to try and figure out how you can get out of something that you were guilty of. You haven't even done that much time in jail yet.

{¶ 25} "THE DEFENDANT: Like I said, I'd like to apologize for any inconveniences I caused the Courts, you, the jurors. I don't see any cost to * * * reassess my * * * responsibilities in this, and the associations that I kept, you know. I wish I could change things around. This is life and I keep seeing with

my life. I am very valuable in my community. I have 10 children that I'm raising. Countless others that I'm seeing to their needs and their well-being. With that, thank you.

{¶ 26} "THE COURT: Thank you. Still got a guy that doesn't admit that he's guilty. From what I sat through, I'm just amazed by that."

{¶ 27} The court then indicated that it considered the purposes and principles of sentencing (R.C. 2929.11) and the seriousness and recidivism factors (R.C. 2929.12) and sentenced Fritz to a total of 30 months in prison. The court explained Fritz's period of postrelease control and the potential resulting sanctions for any violation thereof. Only after Fritz was criticized for exercising his constitutional right to trial and a 30–month term was meted out did the court add:

{¶ 28} "THE COURT: Mr. Fritz, you have failed to take any responsibility whatsoever for this crime throughout, and continue to fail to do so. You weren't paying your child support for those kids anyway and you haven't even declared paternity on some of them. And * * * this is not your first time you have been in prison. All of that is playing into this. Primarily it's just that you won't take responsibility for any of this. You want to apologize to people that you inconvenienced." The court then advised Fritz of his right to appeal, Fritz indicated that he wanted to take the stand but was prevented from doing so by his attorney, and the court indicated, given Fritz's prior felony conviction, that the attorney "was probably using good judgment."

{¶ 29} Fritz received maximum sentences for his fourth- and fifth-degree felony convictions, and he received a minimum sentence on his second-degree felony conviction. R.C. 2929.14. Fritz argues that there "is no such 'unequivocal statement' " here as in *Blanton* to show that his sentences were not enhanced due to his failure to plead guilty. The state relies upon the trial court's consideration of the purposes and principles of sentencing and the seriousness and recidivism factors, as well as the court's postsentence remarks.

{¶ 30} Having reviewed the record, as in *Blanton*, we conclude that the sentencing court's improper remarks, standing alone, support an inference that the judge considered Fritz's refusal to plead guilty when sentencing him. Unlike in *Blanton*, however, the sentencing court's remarks, when read as a whole, do not persuade us that Fritz's refusal to plead guilty was not a factor in the sentence Fritz received. While the trial court observed, "[W]e need a system that protects the innocent," the court did not, as in *Blanton*, acknowledge that Fritz was entitled to exercise his constitutional rights within that system. Instead, the court advised Fritz, "When it's used by the guilty, it's being abused," and the jurors' time is being wasted. These comments suggest that a trial by jury is an option available only for those who are innocent and not a constitutional

right.[1]  A jury trial is available to all citizens, thus, necessarily to the guilty as well as the innocent.  While the court mentions Fritz's refusal to take responsibility for his actions, his lack of responsibility for his children, and his prior prison term, he does so after sentence is imposed, and not before, and the comments do not dispel the inference that Fritz was punished more severely due to his refusal to plead guilty.

{¶ 31} Since the trial court created the appearance that it enhanced Fritz's sentence because Fritz refused to plead guilty, Fritz's first assignment of error is sustained, and the matter is remanded for resentencing before a different judge. We conclude that a different judge must resentence because the trial court's statement suggesting only the innocent have the right to trial evidences a bias and fundamental misconception of appellant's constitutional right to a jury trial. In remanding for resentence, we do not suggest what the sentence should be, nor do we even imply that the sentence actually given was itself inappropriate under the circumstances.  Whatever a new judge in the proper exercise of his discretion may impose, the defendant can at least serve it more constructively, knowing it is for the crimes he committed and not for the constitutional right he invoked.

{¶ 32} Fritz's second assignment of error is as follows:

{¶ 33} "The matter should also be remanded for resentencing because there is at least one other error in sentencing and because the record is confusing."

{¶ 34} According to Fritz, even though the termination entry "cleaned up some of the confusion [at sentencing], it is still incorrect because, at minimum, the sentence in count 4 is improper."  According to Fritz, the offense in count four is a felony of the fifth degree.  Fritz further maintains, citing "this counsel's experience," "any charges from the previous indictment cannot survive the issuance of a new indictment.  Therefore, the trial court also erred in imposing a sentence on a charge that had been superseded."

{¶ 35} Regarding the offense in count four in the B indictment, if the amount of the drug involved "exceeds one gram but is less than five grams of crack cocaine, possession of cocaine is a felony of the fourth degree," and not a felony of the fifth degree.  R.C. 2925.11(C)(4)(b).  Regarding the two indictments, the charge in count four of the A indictment was corrected in count one of the B indictment from a violation of R.C. 2923.32(A)(3) to a violation of R.C. 2923.32(A)(1).  Count two of the B indictment duplicates count two of the A indictment, and the remaining counts in the B indictment are additional charges.  Count one in the A indictment was not duplicated in the B indictment, nor was it nolled or dismissed,

---

1.  "I consider trial by jury as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution."  Thomas Jefferson.

and Fritz was properly convicted on it. Cf. *State v. Zickgraf* (Oct. 7, 1987), Montgomery App. Nos. 10225, 10220, 1987 WL 18198.

{¶ 36} There being no merit to Fritz's second assignment of error, it is overruled.

{¶ 37} Fritz's third assignment of error is as follows:

{¶ 38} "The matter should also be remanded for resentencing because very recent U.S. Supreme Court precedent suggests that Ohio's sentencing scheme, where purveyors of crack cocaine are treated more punitively than sellers of the equal amount of powdered cocaine, cannot withstand constitutional scrutiny."

{¶ 39} Fritz argues that his sentences for counts two and three violate his right to equal protection because the penalty for trafficking in crack cocaine is harsher than the penalty for trafficking in powdered cocaine and is thereby racially discriminatory, since "crack cocaine users tend to be poor and African–American, while powdered cocaine users tend to be Caucasian and wealthier." Fritz relies upon *Kimbrough v. U.S.* (2007), —— U.S. ——, 128 S.Ct. 558, 169 L.Ed.2d 481, arguing that his fourth-degree felony convictions involving crack cocaine should be reduced to fifth-degree felonies.

{¶ 40} First, Fritz did not argue that his right to equal protection was violated before the trial court, and he accordingly waived his right to do so. *State v. Boykin*, Montgomery App. No. 19896, 2004-Ohio-1701, 2004 WL 690799. Further, were we to consider Fritz's argument, Fritz's reliance upon *Kimbrough* is misplaced. *Kimbrough* held that a federal district court may conclude that the Federal Sentencing Guidelines' crack cocaine/powder cocaine disparity[2] results in a sentence "greater than necessary" to achieve sentencing statutes' objectives and may then deviate from the range set forth in the Guidelines for crack cocaine offenses. While *Kimbrough* discusses the disparity that exists between powder cocaine versus crack cocaine sentences at the federal level, the decision did not alter federal or state sentencing guidelines or statutes, and it has no application to Fritz's sentence. See *State v. Jackson*, Lucas App. No. L–08–1098, 2008-Ohio-3700, 2008 WL 2854150. Finally, we have previously determined that the crack cocaine/powder cocaine ratio employed by R.C. 2925.11 "is rationally based upon the greater danger posed by crack cocaine" and is not racially discriminatory. *State v. Bryant* (July 17, 1998), Montgomery App. No. 16809, 1998 WL 399863.

---

2. "The relevant statutes and Guidelines employ a 100-to-1 ratio that yields sentences for crack offenses three to six times longer than those for offenses involving equal amounts of powder. Thus, a major supplier of powder may receive a shorter sentence than a low-level dealer who buys powder and converts it to crack." *Kimbrough*, at syllabus.

{¶ 41} There being no merit to Fritz's third assignment of error, it is overruled.

{¶ 42} Fritz's fourth assignment of error is as follows:

{¶ 43} "The RICO conviction should be reversed because the evidence was insufficient to show that there was a drug trafficking 'enterprise' separate and apart from the racketeering activity."

{¶ 44} "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 70, quoting *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 45} R.C. 2923.32(A)(1) provides, "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity * * *." " 'Enterprise' includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises." R.C. 2923.31(C). " 'Pattern of corrupt activity' means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E). " 'Corrupt activity' means engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in * * *" any violation of R.C. 2925.03 (trafficking in drugs). R.C. 2923.31(I)(2)(c).

{¶ 46} Fritz directs our attention to *United States v. Turkette* (1981), 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246, in which the United States Supreme Court determined, "In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1) (1976 ed., Supp.III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to

establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government." Id. at 583., 101 S.Ct. 2524, 69 L.Ed.2d 246

{¶ 47} Fritz notes, "[A]t least six federal circuits have held that in order to prove its RICO case, the government must show some ascertainable organizational structure beyond whatever structure is required to engage in the pattern of corrupt activity," and he concedes, "[F]ive circuits have rejected any requirement that there be an 'ascertainable structure,' separate or otherwise, for an associated-in-fact enterprise."

{¶ 48} We, along with the Fifth District Court of Appeals, have "resolved cases questioning the existence of an enterprise under the corrupt activity statute without reference to the federal requirements." State v. Owen (Feb. 19, 1999), Miami App. No. 98 CA 17, 1999 WL 76826 (finding "ample evidence in the record of the existence of an organizational structure beyond what was required for the participants to sell drugs," such that we "need not resolve the dissonance between those courts that require the enterprise to exist separate and apart from the corrupt activity and those that do not").

{¶ 49} Fritz urges us "to adopt the view that the enterprise and the structure are separate entities that must be proven separately." The state responds that it must prove only "that a group of persons associated together for a common purpose of engaging in a course of conduct," to establish the existence of an enterprise, as defined in R.C. 2923.31(C), in reliance upon State v. Humphrey, Clark App. No.2002 CA 30, 2003-Ohio-3401, 2003 WL 21487780.

{¶ 50} In Humphrey, the defendant and his cousin participated in several specific incidents of drug-related activity involving the possession and sale of cocaine. In one incident, the defendant sold a kilo of cocaine to an individual, offered the informant in the case one-fourth of a kilo of cocaine, and gave his cousin an amount of cocaine. In another incident, while the defendant was out of town, the informant went to the home of the defendant's cousin and purchased an ounce of cocaine that the defendant had provided to the cousin to sell for him. In a third incident, having again provided his cousin with cocaine to sell, the defendant arranged a sale of five ounces to the informant. When the informant refused to deal with the cousin, the cousin had to return the cocaine to the defendant so the sale could be completed. We determined that the "State's evidence clearly demonstrates that a group of persons [the defendant and his cousin] associated together for the common purpose of engaging in a course of criminal conduct by distributing cocaine in the Springfield area. Moreover, this

was an ongoing organization or entity whose members functioned as a continuing unit. Th[is] is sufficient to demonstrate the existence of an 'enterprise.' [citing *Turkette* ]. Additionally, the 'pattern of corrupt activity' in this case was the series of corrupt acts involving specific incidents of illegal drug activity committed by the participants in the enterprise." Id. at ¶ 41.

{¶ 51} Having examined the evidence admitted at trial in a light most favorable to the state, we conclude, as in *Humphrey*, that the evidence here establishes that at least two persons, Fritz and Messenger, associated together for the common purpose of engaging in a course of criminal conduct by trafficking in drugs from Messenger's apartment. Again, as in *Humphrey*, this was an ongoing organization; Engles learned that drugs were being sold from the apartment, the officers learned the name of one customer and used it to allay any suspicions that Messenger might have had about dealing with a stranger, and Fritz, clearly the decision maker and supplier, and Messenger, the seller, functioned as a continuing unit, twice completing drug transactions with Hutsonpillar in the same fashion: a phone call from Messenger, the arrival of Fritz at the apartment, the controlled buy. Finally, as in *Humphrey*, this evidence is sufficient to establish the existence of an enterprise, and the requisite pattern of corrupt activity was the two sales of crack cocaine to Hutsonpillar, committed by Fritz and Messenger, the participants in the enterprise. For the foregoing reasons, any rational trier of fact could have found the essential elements of engaging in a pattern of corrupt activity were proven beyond a reasonable doubt. Fritz's fourth assignment of error is overruled.

{¶ 52} The judgment is reversed, and the cause is remanded solely for resentencing before a different judge.

Sentence reversed
and cause remanded.

BROGAN and WALTERS, JJ., concur.

SUMNER E. WALTERS, J., retired, of the Third District Court of Appeals, sitting by assignment.