[Cite as *State v. Franklin*, 2011-Ohio-6802.]

### IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | Appellate Case Nos. 24011 |
| Plaintiff-Appellee | : | 24012 |
| | : | |
| v. | : | |
| | : | Trial Court Case Nos. 2008-CR-2354/2 |
| ANTHONY JAMES FRANKLIN | : | 2009-CR-1117 |
| | : | |
| Defendant-Appellant | : | |
| | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

### O P I N I O N

Rendered on the   day of 30th day of December, 2011.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by KIRSTEN A. BRANDT, Atty. Reg. #0070162,and by LAURA M. WOODRUFF, Atty. Reg. #0084161, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

DANIEL J. O'BRIEN, Atty. Reg. #0031461, 1210 Talbott Tower, 131 North Ludlow Street, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Anthony J. Franklin appeals from his conviction and

sentence, following a jury trial, on one count of Possession of Heroin in an amount less than

one gram, one count of Possession of Heroin in an amount equaling or exceeding ten grams, but less than fifty grams, and one count of Engaging in a Pattern of Corrupt Activity. Franklin was sentenced to twelve months' imprisonment on the first possession charge, eight years' imprisonment on the charge of possessing more than ten grams but less than fifty grams of heroin, and eight years' imprisonment for engaging in a pattern of corrupt activity, with all sentences to be served concurrently. Franklin was also fined $15,000 for possession of heroin in an amount exceeding ten grams, and $20,000 for engaging in a pattern of corrupt activity.

{¶ 2} Franklin contends that the trial court erred when it refused to dismiss re-indictment "B" for failure to set forth the predicate offenses of the charge of Engaging in a Pattern of Corrupt Activity. Franklin further maintains that the trial court erred in overruling his *Batson* claim and allowing the State to dismiss jurors at voir dire for racially-motivated reasons.

{¶ 3} In addition, Franklin contends that the trial court erred by failing to provide complete and correct instructions on applicable law, by demonstrating an overt bias toward Franklin and his attorney throughout the trial, by admitting into evidence prejudicial items that had no probative value, and by failing to declare a mistrial after repeated acts of prosecutorial misconduct. Franklin also argues that the trial court erred in joining his trial with that of co-defendant De'Argo Griffin. And finally, Franklin contends that the cumulative effect of all the errors combined deprived him of the right to a fair trial, and that we should examine the record for other possible error.

{¶ 4} We conclude that the indictment charging Franklin with Engaging in a Pattern of

Corrupt Activity in the words of the statute – R.C. 2923.32(A)(1) – is not defective because it fails to specify each corrupt activity in which Franklin is alleged to have participated. The trial court also did not err in accepting as true the prosecutor's race-neutral explanations for two peremptory challenges.

{¶ 5} We further conclude that the trial court did not err in failing to provide an accurate, non-misleading definition of "to participate in" as used in the Engaging in a Pattern of Corrupt Activity statute. However, the trial court did err in failing to instruct the jury concerning the "structure" requirement for violations of the federal Racketeering Influenced and Corrupt Activities Act, Section 1961, et. seq., Title 18 U.S.Code, set forth in *Boyle v. United States* (2009), 556 U.S. 938,129 S.Ct. 2237, 173 L.Ed.2d 1265. The error was prejudicial and requires reversal of Franklin's conviction for Participating in an Enterprise Engaging in a   Pattern of Corrupt Activity.

{¶ 6} We additionally conclude that Franklin was not deprived of a fair trial as a result of the trial court's "overt bias" toward him or his counsel. The irritation expressed by the trial court, out of the presence of the jury, because lead defense counsel was not initially present when the jury announced that it had returned a verdict, did not amount to overt bias toward Franklin, and could not, in any event, have prejudiced the jury, since the jury was not thereafter in the presence of the trial court until its verdict, which had been reduced to writing, was read in open court.

{¶ 7} We also conclude that the trial court did not err in admitting, over Franklin's objection, a compact disc case and a photograph thereof, of an instructional video for drug dealers entitled: "Never Get Busted Again." The case was found in a car with Franklin, in

proximity to a baggie containing heroin, and was relevant to claims that he had participated in an enterprise engaging in a pattern of corrupt activity.

{¶ 8} In addition, we conclude that the trial court did not err in declining to declare a mistrial after the prosecutor's use of a demonstrative exhibit showing the date and location of each criminal act in which each defendant was involved, and bearing the words "drug-trafficking group." The exhibit was for demonstrative purposes only, and the State showed the exhibit only briefly, while questioning some witnesses. The State also agreed to delete the term "drug-trafficking group" from the exhibit. The trial court also did not err in denying Franklin's motion to sever his trial from that of a co-defendant.

{¶ 9} Finally, we conclude that Franklin was not deprived of a fair trial as a result of cumulative error. We decline Franklin's invitation to examine the record in search of any error that he failed to assign.

{¶ 10} Accordingly, the judgment of the trial court is Affirmed in part, and Reversed in part, and this cause is Remanded for further proceedings.

I

{¶ 11} These cases (consolidated appeals CA 24011 and 24012) arise from a series of drug-related incidents that occurred between June 16, 2006, and April 1, 2009. On June 19, 2006, Dayton police officer Joey Myers was working as a plainclothes drug detective. On that day, Myers started to use a payphone at a mini-mart on Third Street in Dayton to call suspected numbers of drug dealers, when he heard someone yell, "Hey." An individual later identified as Franklin walked across the street and asked what Myers was looking for. Upon learning that Myers was seeking crack cocaine and was trying to contact a dealer with whom

he had dealt before, Franklin said his "stuff" was good, and gave Myers a torn-off piece of paper with a cell phone number and the name "Peanut" written above the number. Franklin went back across the street and waved to Myers occasionally while Myers pretended to make multiple calls on the pay phone.

{¶ 12} Eventually, Myers yelled to Franklin that he was going to turn around. Franklin then walked to the rear of a Shell gas station where some alleys intersected. When Myers pulled into the entrance of the area, he told Franklin that he had driven around the block because he had seen a cop. At that point, Franklin said that he thought Myers had wanted weed, which is a street term for marijuana. Myers knew then that Franklin was spooked for some reason, and asked his back-up crew to make contact with Franklin, who had since met up with three other individuals.

{¶ 13} Uniformed officers detained Franklin briefly in reference to a drug investigation. At that point, Myers contacted one of the officers and said that he was going to place a call to the cell phone number that he had been given. The officers released Franklin. Myers called the cell phone number, and said he was looking for some "hard," which is a street name for crack cocaine. The voice asked Myers about his location. When Myers said that he was on Third Street and described his vehicle, the voice immediately said, "Ain't nothing going on," and hung up. The officers who had released Franklin saw him talking on a cell phone as he walked away from them.

{¶ 14} Detective Barett went to the area where Myers had made contact with Franklin to look for contraband, because street-corner dealers generally do not carry drugs. Instead, they hide drugs nearby and get them for each transaction. Barett found a 2000 Ford Taurus

parked behind a vacant building. Barett checked the glove box because the vehicle was damaged and he thought it might have been involved in a hit-and-run. He found a digital scale in the glove box. There was also a wadded-up sales receipt in the passenger door, with a small piece of crack cocaine inside. The sales receipt, which was from Auto Zone, matched up with the piece of torn paper on which Franklin had written his phone number. Franklin was subsequently convicted of possession of more than one gram, but less than five grams of crack cocaine, a fourth-degree felony.

{¶ 15} On October 13, 2007, Dayton police officer John Garrison initiated a traffic stop when he observed a Chevrolet Caprice run up over the curb and into the grass while parking on McCabe Street. Before the officers could get their cruiser stopped, three of the four subjects, including Franklin, who was driving, exited the Caprice and began walking toward 2811 McCabe. This was unusual. Franklin walked to the rear of his vehicle, dipped down for a second, and walked toward the apartment. The other individuals with Franklin were Delaquan Spears, Daeshawn Foster, and Lorenzo Thomas.

{¶ 16} Approximately 1.73 grams of crack cocaine was discovered at the back of the car, where Franklin had dipped down. Approximately 3.38 and 2.77 grams of crack cocaine were discovered, respectively, where Foster and Thomas had been sitting in the car. When Foster was searched, the police found about $480 in cash, along with two cell phones and two scraps of paper that contained two different phone numbers and the word "Peanut" written between the phone numbers. Franklin was later convicted of possession of less than one gram of crack cocaine, a fifth-degree felony.

{¶ 17} Detective Mark Spiers of the Dayton Police Department was one of the officers involved in the June 2006 incident. On June 6, 2008, Spiers was working in the narcotics unit and again encountered Franklin. Spiers was in the area of Salem and Grand Avenues, checking the pay phones, because officers have learned over the years that many drug deals are set up using pay phones. Spiers noticed a white female holding a small piece of paper and attempting to get a phone number from the paper. From experience, Spiers knew that drug dealers often give out their phone numbers on small pieces of paper. Spiers investigated the licenses plates of the woman's car, which was a blue Subaru, and found that the vehicle was from outside Montgomery County. Many heroin buyers do not live in Dayton, but come to Dayton now that heroin is on the rise. Spiers decided to conduct surveillance and advised other deputies to head that way.

{¶ 18} A white Neon automobile occupied by two females pulled into the parking lot next to the Subaru. The female who was making the phone call walked over and talked to the people inside the Neon. Both vehicles then left the gas station, proceeding north on Salem Avenue. The vehicles then began circling the area. At one point, four vehicles were stopped, facing southbound, and the police believed the seller would pull up to each door and make a quick transaction before pulling off. No contact was made, and the four vehicles then proceeded in a caravan to a McDonald's restaurant. None of the occupants of the vehicles patronized the restaurant, however. After about fifteen or twenty minutes, two vehicles left the parking lot. The police decided to maintain surveillance on the Subaru and the Neon. After about five minutes, the two females in the Neon got into the Subaru, and made a number of turns, eventually losing the police. After this occurred, the police saw a maroon Jeep

Liberty that had originally been part of the caravan, and followed it to a parking lot at the intersection of North Gettysburg and James H. McGee Boulevard.

{¶ 19} The police saw a man in a car wash on the other side of Gettysburg talking on a white cell phone and looking in the direction of the Jeep Liberty. This individual then got into the front passenger seat of a metallic blue GMC Yukon. The Yukon was being driven by Franklin. Eventually, the Jeep Liberty and the GMC Yukon met in an isolated parking lot at 14 Carat Gold. At that point, the police could not maintain surveillance, due to the location, and made contact with both cars. As the police pulled up, Franklin was getting out of the driver's side. Franklin looked in Spiers's direction and made a tossing motion. Two gel caps of heroin were found near Franklin, and $550 in cash was found in Franklin's pocket. Franklin was charged with possession of heroin in an amount less than one gram, a fifth-degree felony, arising from this incident.[1]

{¶ 20} In the case before us, Franklin was tried with co-defendant, De'Argo Griffin, who was also charged with drug possession and with engaging in a pattern of corrupt activity. The next incident raised at trial involved undercover officer Myers (who had previously dealt with Franklin), and De'Argo Griffin. On October 16, 2008, Myers was conducting surveillance in the area of Gettysburg, when he saw that a marked crew had made a traffic stop, was surrounded by multiple people, and was alone. Myers turned his vehicle around to see if the officer was okay. Both the driver and passenger of the stopped car gave Myers contact information about drug activity. When one of the people in the vehicle placed a call,

---

[1]This Possession of Heroin case (designated as Montgomery County Common Pleas Court Case No. 2008 CR 0235/2), was tried together with Montgomery County Common Pleas Court Case No. 2009 CR 1117/1, the Pattern of Corrupt Activity case. Both cases have been consolidated for purposes of the current appeal.

Myers was able to listen to the voice, which provided another number to call. Myers also heard the voice on the second call, which gave information on where to go to purchase eight caps of heroin. Myers was placed in the car with the buyers, and they subsequently purchased the heroin for eighty dollars from a person driving a white Chrysler automobile. Keith Strickland was driving the seller's car and Griffin was in the front passenger seat.

{¶ 21} After the police stopped Strickland's vehicle, Myers heard Griffin's voice and matched it to the voice he had heard on the phone. The police also recovered a cell phone from Griffin, and the number of the phone matched the number that the buyers had dialed.

{¶ 22} On January 22, 2009, Officer John Walters of the Montgomery County Sheriff's Office stopped a Pontiac Grand Prix for a window tint violation. Walters was in the area that day in response to a citizen complaint. A citizen had taken a picture of the license plate of a white Jeep Grand Cherokee, and had observed the Jeep in the area and being involved in a drug transaction.

{¶ 23} The driver of the Grand Prix, Monique Pope, appeared overly nervous when the car was stopped. On checking, Officer Walters also noticed that the Jeep Grand Cherokee that had been recently involved in a drug transaction was registered in Pope's name. Based on that information, Walters called for a canine free-air search. The dog alerted, and officers then searched the Grand Prix. Franklin was the front seat passenger, Griffin was the right rear passenger, and David Miner was the left rear passenger. One suspected heroin capsule was found underneath the driver's seat and a bag containing 32 gel capsules of heroin, weighing 2.48 grams, was found inside the rear passenger armrest. Pope had $901 in currency.

{¶ 24} Deputy Bemis of the Montgomery County Sheriff's Office conducted the canine free air search on January 22, 2009. Four days later, Bemis noticed a white Jeep Cherokee following a black Saturn too closely. Bemis stopped the vehicle, which was being driven by Monique Pope, with Franklin as the passenger. Bemis recognized them from the stop on January 22, 2009, and decided to do a free-air sniff of the vehicle. The dog again alerted, and Bemis located heroin, with a net weight of 7.10 grams, underneath the center console housing on the passenger side. The police also found a DVD entitled: "Never Get Busted Again," located near the heroin, and $254 in currency on Franklin. The dog additionally alerted to the currency.

{¶ 25} In February 2009, the organized crime unit received information about an individual known as "Tight" who was selling drugs from a room at the Knight's Inn on Maxton Avenue in Butler Township. The unit was given a phone number to use, and placed a call seeking to purchase heroin. After being told to go to a place on Hoover Avenue, the unit decided not to pursue it, due to lack of time to coordinate. Subsequently, on March 17, 2009, the organized crime unit received another call from the narcotics unit, indicating that "Tight" was back at the Knight's Inn. At that time, the two units decided to conduct a joint operation.

{¶ 26} Plainclothes detective Paul Henson called the cell number provided, and arranged with "Tight" to purchase three caps of heroin at Room 323. When Henson entered the room, Daeshawn Foster answered the door, and another person later identified as De'Argo Griffin was lying on the bed next to the window. Griffin asked whether Henson had called for "Tight" or "Fresh." When Henson responded, "Tight," Griffin said, "Okay, he's yours.

Go ahead and deal with him." Trial Transcript, p. 372. Foster reached in a clear baggie that was lying on the bed, removed three capsules and said he needed thirty dollars. When Henson told him that he only had forty dollars, Foster said, "Oh, that's what I mean." Id. at p. 375. Griffin then said, "Knock that sh*t off. They're ten dollars apiece. Either give him another cap or give him ten dollars back." Id. at p. 376. Foster then gave Henson a fourth cap of heroin.

{¶ 27} After Henson left, the police entered the room and arrested Foster and Griffin. In addition to the four caps of heroin that had been sold to Henson, the police located 89 capsules, or 6.38 grams of heroin on the bed next to Foster. They also recovered $810 from Griffin and $2,542 from Foster, which included the two twenties the police had used to buy the heroin.

{¶ 28} The final matter discussed at trial involved events that occurred from March 31 to April 1, 2009. On March 31, 2009, Dayton Police Department narcotics detective David House was working as an undercover officer attempting to make a heroin purchase. After calling a phone number and agreeing to purchase a gram of heroin for $100, House was directed during a series of conversations to go to Fairbanks Avenue. When he arrived, a grey and white conversion van quickly flashed its lights, leading House to believe he should pull over. House pulled over to the driver's side, and the driver told him to pull up and turn around. As House tried to do so, the van took off at a high rate of speed. House was unable to get the license plate, but noticed that it was a temporary tag. After calling the individuals again, he was told that he was the "police." House was then directed to several more places, and the individuals ultimately identified House by name. Thus, the transaction never

occurred.

{¶ 29} The next day, House was working with detective Kevin Phillips, and spotted a white and grey conversion van with a temporary license plate. House watched the vehicle pull into the parking lot of an AMPM convenience store located on Salem Avenue. House contacted two narcotics officers and asked them to make contact with the vehicle. The officers were in a marked cruiser. When the cruiser drove through the lot, the side passenger door of the van was flung open, and Franklin jumped out of the seat by the door. Franklin fled on foot, but was apprehended shortly thereafter and brought back to the van. Griffin was sitting in the front passenger seat of the van, and Daeshawn Foster was in the third seat, which was a bench seat in the back.

{¶ 30} The officers found a bag of heroin in the map pocket on the back of Griffin's seat, which was directly in front of where Franklin was sitting. The bag contained about 27 grams of heroin. There was also a baggie containing 27 gel capsules of what appeared to be heroin, and a baggie containing a four-gram chunk of heroin. These baggies were sitting in a cup holder behind the driver's seat. A large baggie of unused gel capsules was lying on the center console immediately to Griffin's left. In addition, bags containing unused gel capsules and baggies containing what appeared to be heroin residue were found in the storage pouches behind the seats where Franklin had been sitting. The officers also found a razor, a South Park DVD case, and a plate in the back storage area behind the back bench. Four cell phones were located in the area of the drugs, one of which was a black LG cell phone.

{¶ 31} While the officers were there, the LG cell phone rang. Detective Hall answered the phone and was told by an individual (later identified as Heather Reineke) that

she needed "eight." Hall directed Reineke to the AMPM mart, where she was subsequently arrested. After Reineke was arrested, Hall verified that her cell phone number matched the number of the phone that had been calling the LG cell phone. Detective House also recovered $3,500 in cash from Franklin's front left pocket, and $53 from his left rear pocket. Foster and Griffin each had around $260 in cash.

{¶ 32} At the time of the arrest, Reineke lived in Sidney, Ohio, and purchased drugs in Dayton, because it was the closest place to do so. Reineke began purchasing heroin in November 2008 from a person named "Peanut." She had received the number from a friend in Shelby County, and it was programmed into her cell phone. Reineke indicated that she had purchased heroin four or five hundred times, and was calling the Peanut number two or three times a day. When she called the number, it was not always the same voice on the end of the line. Reineke would tell them who she was, and would ask to get eight caps, or ten caps. She would be given instructions about where to go. Reineke had come down twice on April 1, 2009, to buy drugs, and had purchased drugs earlier that day in Dayton.

{¶ 33} Reineke also indicated that when she called the Peanut number, sometimes she went to side streets, and sometimes went to the Knight's Inn. When she showed up to purchase drugs, she did not always see the same person. There were five or six men she bought from after calling the Peanut number. Reineke stated that she had never seen either Griffin or Franklin before, and that she would not be able to identify any dealer from whom she had bought. When she purchased drugs, she was either high or in withdrawal and wanted to get her drugs and get out as soon as possible.

{¶ 34} After hearing the evidence, the jury found Franklin guilty of Engaging in a

Pattern of Corrupt Activity from May 13, 2006, to April 1, 2009. Underpinning the verdict were findings that Franklin was involved in the sale of crack cocaine on June 19, 2006, that he was involving in transporting drugs for sale (heroin) on June 8, 2008, that he was involved in possession of 7.1 grams of heroin on January 26, 2009, and that he was involved in possession of 33.19 grams of heroin on April 1, 2009. The jury also found Franklin guilty of five counts of Possession of Criminal Tools, one count of Possession of Heroin in the amount of 33.19 grams on April 1, 2009, and one count of Possession of Heroin in an amount less than one gram on June 6, 2008. Franklin was sentenced to eight years in prison on the Pattern of Corrupt Activity charge, eight years for Possession of Heroin on April 1, 2009, twelve months for Possession of Criminal Tools, and twelve months for Possession of Heroin on June 6, 2008. All sentences were to run concurrently.

{¶ 35} Franklin appeals from his conviction and sentence.

II

{¶ 36} Franklin's First Assignment of Error is as follow:

{¶ 37} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DID NOT DISMISS RE-INDICTMENT 'B' FOR FAILING TO SET FORTH THE PREDICATE OFFENSES OF THE CHARGE OF ENGAGING IN A PATTERN OF CORRUPT ACTIVITY."

{¶ 38} The Sixth Count of the October 26, 2009 indictment, entitled "Re-indictment 'B' ," alleges that: "ANTHONY JAMES FRANKLIN AKA: PEANUT, DAESHAWN J. FOSTER, and DE'ARGO AD GRIFFIN between the dates of MAY 13, 2006 THROUGH APRIL 2, 2009 in the County of Montgomery, aforesaid, and State of Ohio, employed by, or

associated with, any enterprise did conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt and at least one incident of corrupt activity is a felony of the second degree, to-wit: POSSESSION OF HEROIN (10 - 50 GRAMS), in violation of O.R.C. 2925.11(A), a felony of the second degree, which occurred on APRIL 1, 2009, at or near 2317 SALEM AVENUE, DAYTON, OHIO; contrary to form of the statute (in violation of Section 2923.32(A)(1) of the Ohio Revised Code) in such case made and provided, and against the peace and dignity of the State of Ohio."

{¶ 39} R.C. 2923.32(A)(1) provides: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."

{¶ 40} R.C. 2923.32(B)(1) provides, in pertinent part: "Whoever violates this section is guilty of engaging in a pattern of corrupt activity. * * * .  Except as otherwise provided in this division, if at least one of the incidents of corrupt activity is a felony of the first, second, or third degree, * * * , engaging in a pattern of corrupt activity is a felony of the first degree."

{¶ 41} Thus, in order to charge Franklin with Engaging in a Pattern of Corrupt Activity as a felony of the first degree, it was incumbent upon the State to allege that at least one of the incidents comprising the corrupt activity was a felony of the first, second, or third degree (or certain other unclassified felonies not relevant herein).  The indictment did contain an allegation to that effect.  Otherwise, the indictment charged the offense in the words of the statute proscribing the offense, with the addition of a time-frame.

{¶ 42} Franklin contends that the indictment is defective because it did not allege specific offenses comprising the corrupt activity, other than the one second-degree felony of Possession of Heroin. He first cites *State v. Burkitt* (1993), 89 Ohio App.3d 214, a decision of this court, in support of that proposition. In *Burkitt*, the defendant argued that he had not been put on notice of all of the predicate offenses for a charge of Engaging in a Pattern of Corrupt Activity that he should have been prepared to defend himself against. The defendant did not argue that the indictment was defective. Id. at 224. We opined that: "It appears that the indictment *may* in fact have been insufficient to notify the appellant of everything he could expect to have to defend himself against." Id. (Emphasis added.) We then concluded that the defendant had not raised this issue in the trial court, and that it did not rise to the level of plain error. Thus, we never actually held that an Engaging in a Pattern of Corrupt Activity indictment is deficient if it does not specify the predicate offenses, and we necessarily held that even if it were deficient for that reason, it would not affect the subject-matter jurisdiction of the trial court, since a plain-error analysis would not have been germane in that event.

{¶ 43} Franklin cites *State v. Grimm* (April 25, 1997), Miami App. Nos. 96-CA-37 and 96-CA-38, in support of the proposition that an Engaging in a Pattern of Corrupt Activity indictment must specify the predicate offenses. In *Grimm*, the issue was raised in a petition for post-conviction relief. In affirming the denial of the petition, we held that because the deficiency of the indictment could have been raised in a direct appeal, the defendant was barred by the doctrine of res judicata from raising it in a petition for post-conviction relief. Obviously, we did not hold that an indictment for Engaging in a Pattern of Corrupt Activity is defective if it does not specify the predicate offenses, since we did not reach that issue.

{¶ **44**} In *State v. Childs*, 88 Ohio St.3d 194, 2000-Ohio-298, the Supreme Court of Ohio held that a conspiracy indictment must specify the required overt act in the furtherance of the conspiracy, even when the overt act is specified in a bill of particulars. But that opinion is noteworthy in that the Supreme Court of Ohio expressly distinguished a contrary result in *State v. Murphy* (1992), 65 Ohio St.3d 554 (a case in which a felony-murder indictment did not specify the events comprising the felony underlying the felony-murder charge), because the conspiracy statute, R.C. 2923.01(B), expressly requires that an overt act be both alleged and proven. The Engaging in a Pattern of Corrupt Activity statute, in contrast, does not require that the specific incidents comprising the corrupt activity must be both alleged and proven.

{¶ **45**} Franklin also cites *State v. Siferd*, 151 Ohio App.3d 103, 2002-Ohio-6801. Significantly, in *Siferd*, it was held that the defendant could not raise the defective indictment issue after he had pled to the indictment and the trial had begun, citing Crim. R. 12(B)(2) – now Crim. R. 12(C)(2) – and *State v. Lee* (March 25, 1992), Lorain App. No. 91-CA-005137. *Siferd*, at ¶24. In the case before us, Franklin did not challenge the sufficiency of the indictment until late in the trial.

{¶ **46**} The general rule is that an indictment utilizing the words of the applicable section of the statute is sufficient. *Murphy*, 65 Ohio St.3d at 583, citing *State v. Landrum* (1990), 53 Ohio St.3d 107, 119. It is true, as Franklin points out, that the Supreme Court of Ohio in *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, ¶11, opined that: " * * * an indictment that tracks the language of the charged offense and identifies a predicate offense by reference to the statute number need not also include each element of the predicate offense in

the indictment." But it does not necessarily follow that an indictment that does not identify a predicate offense by reference to the statute number is deficient. And *State v. Buehner*, at ¶10, cites with approval *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶30, in which the Supreme Court of Ohio held that: "Here, the omission of the underlying felony [to a Kidnapping charge brought under R.C.2905.01(A)(2)] in the indictment was remedied because the bill of particulars identified the underlying felony, as is permitted where the indictment sufficiently tracked the wording of the kidnapping statute."

{¶ 47} Finally, Franklin cites *State v. Cimpritz* (1953), 158 Ohio St. 490. In that case, an indictment for Attempted Burglary was held to have been deficient because it failed to allege that the breaking and entering, or attempt to break and enter, was "maliciously and forcibly done," which was an essential element of the offense under the statute then in effect. Thus, the indictment in that case failed to charge an offense utilizing the words of the applicable statute, unlike the indictment in the case before us.

{¶ 48} Franklin does not allege that he was without notice of the predicate acts upon which the State intended to rely in proving the charge of Engaging in a Pattern of Corrupt Activity. Those acts were specified in a bill of particulars that the State filed well before trial.

{¶ 49} Franklin's First Assignment of Error is overruled.

III

{¶ 50} Franklin's Second Assignment of Error is as follows:

{¶ 51} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED APPELLANT'S *BATSON* CLAIM AND ALLOWED THE STATE TO

CHALLENGE AND TO DISMISS PROSPECTIVE AFFICAN-AMERICAN [sic] JURORS AT VOIR DIRE FOR RACIALLY MOTIVATED REASONS."

{¶ 52} Under this assignment of error, Franklin contends that the trial court committed reversible error when it allowed the State to dismiss two African-American jurors during voir dire.

{¶ 53} "A challenge to the State's exercise of a peremptory challenge upon the ground of racial discrimination is a three-step process. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Then, the proponent of the challenge must provide a racially neutral explanation for the challenge. But the explanation need not rise to the level justifying a challenge for cause. Finally, the trial court must find, based upon all of the circumstances, whether the opponent has proved purposeful racial discrimination." *State v. Williams*, Montgomery App. No. 19963, 2005-Ohio-3172, ¶15, citing *Batson v. Kentucky* (1966), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69.

{¶ 54} "A trial court's factual finding that the state did not exercise its peremptory challenges with a racially discriminatory intent 'largely turn[s] on evaluation of credibility.' *Batson v. Kentucky*, supra, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 89, fn. 21. As a result, the trial court's determination is to be accorded great deference, and will not be disturbed on appeal unless, based on the record, it is clearly erroneous." *State v. Nobles* (1995), 106 Ohio App.3d 246, 281. (Citations omitted.)

{¶ 55} In the case before us, Franklin initially objected to the array, because it contained only one male and two or three females who appeared to be African-American. The trial court noted that it would take the issue under advisement. The court then

questioned jurors about whether they had any reason they could not serve. One African-American female, Mrs. D,[2] asked to be excused because her husband was a diabetic and an advanced glaucoma patient, and she had to be at home to give him medication. Trial Transcript, pp. 19-20. When the court heard that D's daughter could give the medication, the court said it would take that under consideration. D then interrupted to ask if a question in the jury questionnaire involving having a felon in the family would include a grandson. Id. at pp. 21-22. The court indicated this question would be discussed later. Id. at p. 22.

{¶ 56} In a sidebar conference that occurred shortly thereafter, Franklin's counsel noted that only one African-American female (D) was in the first panel of twelve jurors, and that her presence was tenuous, due to her husband's medical condition. Franklin's counsel also noted that the next nine potential jurors consisted of one black female and no males. Id. at pp. 27-28.

{¶ 57} After the court finished its questions, the prosecutor questioned D and other jurors about whether they knew someone who had been convicted of a felony. D indicated that her grandson had a felony drug charge, and that to her knowledge, he had not been treated right and had been accused of things others had done. Id. at p. 51. D also stated that she felt her grandson had been given so much time, but that she could be fair and impartial if she believed the defendants would get fair treatment. Id. at pp. 51-52. When D was questioned by the defense, she again said she could be fair and impartial. Id. at pp. 117-19.

{¶ 58} After challenges for cause had been made, the court heard testimony from a jury coordinator about how prospective jurors are chosen in Montgomery County, which is done by computer, based on an algorithm. The trial judge also noted that he had previously

---

[2]The jurors' full names are omitted to protect their privacy.

served as chair of a jury committee among the judges, which reviewed racial composition of juries. The court overruled the defense objection to the jury selection process, because there was not sufficient proof regarding unfairness in jury selection. The court then went on to consider peremptory challenges. On its fourth peremptory challenge, the State asked to strike D. After the defense objected, the court asked the State to provide reasons why the selection was racially neutral. In response, the prosecutor stated as follows:

{¶ 59} "The State's basis with respect to Ms. [D] is multi-fold. One very significant certain [sic] is that she had a grandson who was a felon. Not only was he a felon, but he was a felon who – for drug charges. That's the heart of our case here. She stated that she thought he had gotten a bad deal, that he had been sentenced way too hard, clearly had lingering resentment with respect to how her grandson was treated. Her resentment was so high that I was asking another question about do you think you could be fair and impartial, and she jumped and raised her hand and I was talking about something else completely about people who knew people in law enforcement. She was so eager to say about her grandson and how that affected her. She also raised the same with the Court before we even got to the point where we're talking about knowing somebody who's a felon. So that is something that is heavily playing on her mind. She did say that she could be fair and impartial, but the way she stated was she thinks she can be fair and impartial once she heard all the evidence. And she also made the statement that she could be fair and impartial if she thought the person had gotten a fair shake. That just is not somebody who's coming in – she's coming in here with emotional biases because of her – because of her son. She also has put on the jury questionnaire that – or I'm sorry – I said son. It was her grandson – that she did have child –

or husband care issues with respect to his glaucoma and his diabetes, and that was clearly weighing on her heavily." Id. at pp. 194-95.

{¶ 60} The prosecutor also noted that she had consistently excused others from this particular jury panel who had loved ones involved in the criminal justice system. After hearing the explanation, the court concluded that the State had provided a racially neutral explanation.

{¶ 61} On appeal, Franklin contends that the prosecutor's recollection is inaccurate, and was made to a judge who had "already joined the prosecutor's team." We disagree. The trial judge was attentive and responsive to the defense arguments about jury selection. In fact, after opening statements, the judge took time to hear substantial testimony from the Director of Jury Management for Montgomery County regarding jury selection techniques. According to the 2000 census, about 18% of the population in Montgomery County is African-American. The director indicated that under-representation of African-Americans in jury pools is typically about two percent, and the jury system in Montgomery County is within the guidelines of what jury commissions and courts throughout the nation find acceptable.

{¶ 62} The trial judge was also in a position to gauge the credibility of the prosecutor's account, and to see the demeanor of the prospective juror. The judge's decision was not clearly erroneous.

{¶ 63} The State also made a peremptory challenge to another African-American juror, Ms. B. Upon being challenged by the defense pursuant to *Batson*, the State indicated that its information was largely based on information from the State's representative. According to the State, B was text-messaging a lot while they were in court and was one of the people who

were lying down and sleeping in the hallway. In addition, the State's representative was concerned because B was employed by Sugarcreek Packing Company, which was described as a relatively small business that is a source of many of the State's active major drug investigations. The defense responded that B had child-care issues that would explain why she was on the phone, that she had no criminal record, and that she had some college education. The prosecutor then added some of her own observations of non-verbal matters, like the fact that B had gasped or had sighed, had been slumped over several times, and did not act like she was interested in being there. The prosecutor even mentioned that B had said "You got [sic] to be kidding me," at one point when the court called a break. Id. at p. 250.

{¶ 64} The trial court concluded that the involvement with the Sugarcreek Packing Company was a race-neutral explanation. Furthermore, the court stated that in order to have a proportionate number of African-American jurors, two would not be quite enough, and three would be more than proportionate to the population. The court noted that the jury was somewhere in-between at present, but a third African-American was not necessary. Accordingly, the court overruled the *Batson* objection.

{¶ 65} After reviewing the record, we do not conclude that the trial judge's decision was clearly erroneous. Franklin criticizes the trial court for not requiring more factual information, but the State did indicate that Sugarcreek Packing was not large and that major drug investigations were ongoing, per the State's representative. The trial court was not required to call a police officer to the stand to reveal details of the investigation. The State only needed to provide a race-neutral explanation, and " '[t]he second step of this process does not demand an explanation that is persuasive, or even plausible.' " *State v. Gowdy*, 88

Ohio St.3d 387, 392, 2000-Ohio-355, quoting from *Purkett v. Elem* (1995), 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834.

{¶ 66} Accordingly, Franklin's Second Assignment of Error is overruled.

IV

{¶ 67} Franklin's Third Assignment of Error is as follows:

{¶ 68} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO PROVIDE COMPLETE AND CORRECT INSTRUCTIONS TO THE JURY ON THE LAW APPLICABLE TO THIS CASE."

{¶ 69} Under this assignment of error, Franklin contends that the trial court's instructions to the jury were prejudicial in three respects: (1) the court erroneously instructed the jury on the definition of the term "participate in," as used in R.C. 2923.32(A)(1); (2) the court erroneously denied Franklin's request to instruct the jury on precedent in this appellate district regarding the standard to be used to convict defendants of engaging in a pattern of corrupt activity; and (3) the court erred when it denied Franklin's request to instruct the jury on applicable federal law, as required in this appellate district. We will discuss each of these matters.

A. Definition of "Participate In."

{¶ 70} As a general matter, "[t]he trial court has discretion to determine proper jury instructions. 'The trial court does not commit reversible error if the instructions are sufficiently clear to enable the jury to understand the law as applied to the facts.' " *State v. Darkenwald*, Cuyahoga App. No. 83440, 2004-Ohio-2693, ¶48. (Citation omitted.) "Whether the jury instructions correctly state the law is a question of law which an appellate

court reviews de novo. * * * A reviewing court will not reverse unless an instruction is so prejudicial that it may induce an erroneous verdict." Id. (Citations omitted.)

{¶ 71} Franklin was charged with having violated R.C. 2923.32(A)(1), which provides that:

{¶ 72} "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt."

{¶ 73} The trial court defined "participate in," over the objection of the defense, as:

{¶ 74} "Participating in – to participate means to take part in and is not limited to those who has [sic] directed the pattern of corrupt activity. Participate encompasses those who have performed activities necessary or helpful to the operation of the enterprise either directly or indirectly without an element of control." Trial Transcript, p. 1863.

{¶ 75} Franklin argued below, and contends here as well, that the definition of "participate in" is derived from a decision of the Third District Court of Appeals in *Siferd,* supra, 151 Ohio App.3d 103, 2002-Ohio-6801. In *Siferd*, the court concluded that a defendant need not have taken part in directing the affairs of an enterprise in order to be held culpable, but need only have participated in its affairs, as that term is used in ordinary meaning according to the usage of English language. Id. at ¶34. The court, therefore, held that the trial court did not err in instructing the jury that " '[t]he phrase "conduct or participate in, directly or indirectly," is to be given ordinary meaning according to the usage of the English language.' " Id. at ¶37.

{¶ 76} Franklin contends that we have not determined that *Siferd's* interpretation is

correct. Franklin also maintains that we previously held in *State v. Hughes* (March 13, 1992), Miami App. No. 90-CA-54, that there is no need to establish definitions for terms that individuals of ordinary intelligence can easily understand.

**{¶ 77}** In *Hughes*, the defendant contended that R.C. 2923.32 was unconstitutionally void for vagueness because, among other things, the term "associated with" was undefined. We rejected this contention, concluding that this is not a term of art, nor is it a term that persons of ordinary intelligence could not understand when reading R.C. 2923.32(A)(1) in its entirety. Id. at *5. We did not, however, reject the use of dictionary definitions in jury instructions, nor did we reject such definitions to explain the terms in R.C. 2923.32. In fact, we actually referred to the dictionary definition of "associate" during our analysis. Id.

**{¶ 78}** In reviewing the jury instructions in the case before us, we do not conclude that the jury was confused or misled in any way by the definition. Furthermore, while we have not previously considered *Siferd*, Franklin did not argue at trial that he was a mere participant in the enterprise rather than a director; Franklin raised the argument that the trial court should require instructions explaining that the State must prove the existence of an enterprise as well as a pattern of corrupt activity.

**{¶ 79}** Franklin's first argument is without merit.

B. Standards in the Second District Court of Appeals

and the Application of Federal Law

**{¶ 80}** In his second argument, Franklin contends that the trial court erred in refusing to instruct the jury in accordance with *State v. Fritz*, 178 Ohio App.3d 65,

2008-Ohio-4389. According to Franklin, we concluded in *Fritz* that evidence of an ongoing organization, with the defendant as a decision-maker and supplier, and another party as seller, functioned as a continuing unit and established the existence of an enterprise. Franklin, therefore, argues that the trial court should have instructed the jury on these requirements. Franklin's third argument is that the jury should have been instructed in accordance with federal law, which defines an "enterprise."

{¶ 81} The State responds by noting that in *Fritz* we were comparing the evidence favorably with our prior decision in *State v. Humphrey*, Clark App. No. 2002 CA 30, 2003-Ohio-3401, which found sufficient evidence of an enterprise. In addition, the State contends that we previously declined to adopt the federal definition of "enterprise" in *State v. Owen* (Feb. 19, 1999), Miami App. No. 98 CA 1. We will consider these arguments together, because they are interrelated.

{¶ 82} "[I]t is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge." *State v. Scott* (1986), 26 Ohio St.3d 92, citing *State v. Nelson* (1973), 36 Ohio St.2d 79. Furthermore, "[w]hen examining alleged errors in a jury instruction, a reviewing court must consider the jury charge as a whole and 'must determine whether the jury charge probably misled the jury in a matter materially affecting the complaining party's substantial rights.' * * * Whether the jury instructions correctly state the law is a question of law which an appellate court reviews de novo. * * * ." *State v. Darkenwald*, Cuyahoga App. No. 83440, 2004-Ohio-2693, ¶48. (Citations omitted.)

{¶ 83} After the State rested, Franklin moved to dismiss the corrupt pattern charge,

because of lack of proof of an enterprise. Franklin's argument was based on *Boyle,* supra, (2009), 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265, which held that the existence of an enterprise is a separate element from the pattern of racketeering activity. Trial Transcript, pp. 1705 and 1716. The defense also asked the trial court to instruct the jury in this regard, and with regard to the fact that the members of an enterprise must be functioning as a continuing group, and must be attempting to do some common purpose as a group. Id. at pp. 1708-09. The defense renewed the motion to dismiss after resting, and also extensively argued the application of the law in *Boyle*, when jury instructions were being considered. Id. at pp. 1832-36.

{¶ 84} The trial court overruled the motions to dismiss, and refused to instruct the jury as requested. The court instructed the jury only on the definition of "enterprise" found in R.C. 2923.31(C), which states that:

{¶ 85} " 'Enterprise' includes any individual, sole proprietorship, partnership, limited partnership, corporation, trust, union, government agency, or other legal entity, or any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises."

{¶ 86} In *Herakovic v. Catholic Diocese of Cleveland*, Cuyahoga App. No. 85467, 2005-Ohio-5985, the Eighth District Court of Appeals observed that the definition of enterprise in R.C. 2923.31(C) "is substantially the same as the federal RICO definition of enterprise." Id. at ¶21. The Eighth District further stressed that, "[i]n fact, R.C. 2923.31(C) uses the language set forth in the United States Supreme Court's decision of *United States v.*

*Turkette*, which expanded the definition of 'enterprise' to include illicit as well as licit enterprises." Id.

{¶ 87} In *United States v. Turkette* (1981), 452 U.S. 576, 583, 101 S.Ct. 2524, 2228-29, 69 L.Ed.2d 246, the United States Supreme Court held that:

{¶ 88} "In order to secure a conviction under RICO, the Government must prove both the existence of an 'enterprise' and the connected 'pattern of racketeering activity.' The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the Government."

{¶ 89} In two early cases, we refrained from deciding whether to follow federal authority, which had held that an enterprise is required to exist separate and apart from the pattern of corrupt activity. Our reasoning was that we found "ample evidence in the record of the existence of an organizational structure beyond what was required for the participants to sell drugs." *State v. Zorn* (Feb 12, 1999), Miami App. No. 98 CA 16, and *State v. Owen*

(Feb. 19, 1999), Miami App. No. 98 CA 17. In these cases, which involved different members of the same drug-selling organization, we noted some "dissonance" among federal courts, because some circuits required an existence of the enterprise "separate and apart" from the pattern of criminal activity, while others did not feel that proof of a more formalized structure was required. *Zorn*, at *5.[3]

{¶ 90} Both before and after our decisions in *Zorn and Owen*, other appellate districts in Ohio had applied federal law in cases brought under R.C. 2923.32. For example, in *State v. Teasley*, Franklin App. Nos. 00AP–1322, 00AP–1323, 2002-Ohio-2333, the Tenth District Court of Appeals noted that:

{¶ 91} "R.C. 2923.32 ('the Ohio RICO Act') is patterned after the Federal RICO Act, Section 1962, Title 18, U.S.Code. *Sheets v. Carmel Farms, Inc*. (1997), Franklin App. No. 96APE09–1224. Consequently, Ohio courts often look to federal case law for guidance in applying Ohio's RICO Act. Id. In keeping with this practice, this court has applied the three-part test used by the federal courts to determine whether an 'enterprise' exists under the Federal RICO Act to Ohio's RICO Act. *State v. Warren* (1992), Franklin App. No. 92AP–603. In *Warren*, this court concluded that, in order to establish the existence of an 'enterprise' under Ohio's RICO Act, there must be some evidence of: (1) an ongoing organization, formal or informal; (2) with associates that function as a continuing unit; and (3) with a structure separate and apart, or distinct, from the pattern of corrupt activity. Id.;

---

[3]This dissonance may be more imagined than real. For example, in one of the cases cited in *Zorn*, the United States Second Circuit Court of Appeals agreed with *Turkette* that the government is required to prove both the existence of an "enterprise" and a "pattern of activity." *United States v. Mazzei* (C.A. 2, 1983), 700 F.2d 85, 89. Relying on *Turkette's* statement that at times the proof may "coalesce," the Second Circuit observed that "it did not read *Turkette* to hold that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements." Id.

*United States v. Turkette* (1981), 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246."
*Teasley*, 2002-Ohio-2333, at ¶53.

**{¶ 92}** The above test, taken from *Turkette,* has been applied by other Ohio appellate districts. See *State v. Scott*, Morgan App. No. 06 CA 1, 2007-Ohio-303, ¶ 45 (Fifth District); *Herakovic*, 2005-Ohio-5985, at ¶23-24 (Eighth District, civil RICO case); *State v. Boyd*, Ottowa App. No. OT-06-034, 2008-Ohio-1229, ¶38-39 (Sixth District); and *Ramminger v. Archdiocese of Cincinnati*, Hamilton App. No. C-060706, 2007-Ohio-3306, ¶20 (First District, civil RICO case).[4]

**{¶ 93}** In addition, the Eighth District Court of Appeals held in 1994 that "an enterprise 'is not a "pattern of racketeering activity," but must be "an entity separate and apart from the pattern of activity in which it engages.["] ' " *U.S. Demolition & Contracting, Inc. v. O'Rourke Constr. Co.* (1994), 94 Ohio App.3d 75, 85, quoting from *Old Time Enterprises, Inc. v. Internatl. Coffee Corp.* (C.A.5, 1989), 862 F.2d 1213, 1217. Accord *State v. Theisler*, Trumbull App. No. 2005-T-0106, 2007-Ohio-213, ¶30-33 (Eleventh District) (noting that Ohio's RICO statutes are patterned after federal law, and that an "enterprise is not a 'pattern

---

[4]The Fifth District Court of Appeals subsequently followed *Scott* in *State v. Cochran*, Licking App. No. 09CA0088, 2009-Ohio-5977, holding again that an enterprise is established by the three-part test, which includes "a structure separate and apart, or distinct, from the pattern of corrupt activity." Id. at ¶17. Inexplicably, in an earlier decision in 2009, the Fifth District ignored its own prior authority and stated that "Since Ohio courts have not required that an 'enterprise' have an existence separate and apart from the underlying corrupt activity, defendant's convictions were supported by sufficient evidence." *State v. Linkous*, Licking App. No. 08CA51, 2009-Ohio-1896, ¶115. The Fifth District repeated this holding in *State v. Yates*, Licking App. No. 2009 CA 0059, 2009-Ohio-6622, ¶32-33, again, without referring to its own prior authority. We also note that in 2002, the Supreme Court of Ohio certified a conflict between *Teasley* and two other cases regarding "Whether, in a prosecution for engaging in a pattern of corrupt activity under R.C. 2923.32, the state is required to prove the existence of an ongoing organization separate and distinct from the pattern of corrupt activity in order to establish the existence of an 'enterprise' as defined in R.C. 2923.31(C)." *State v. Teasley,* 96 Ohio St.3d 1510, 2002-Ohio-4950 (Table). The conflict cases were *State v. Elersic*, Lake App. Nos. 2002-L-062 and 2000-L-164, 2001-Ohio-8787, and *State v. Wilson* (1996), 113 Ohio App.3d 737, from the Fourth and Ninth Districts, respectively. The Supreme Court of Ohio later dismissed the certification of conflict as having been improvidently certified, stating that no conflict existed. See *State v. Teasley*, 99 Ohio St.3d 1226, 2003-Ohio-4047, ¶1. The court did not elaborate on its reasoning.

of racketeering activity,' but must be 'an entity separate and apart from the pattern of activity in which it engages.' "); *Morrow v. Reminger & Reminger Co.*, *L.P.A.*, 183 Ohio App.3d 40, 58-59, 2009-Ohio-2665, ¶36 (Tenth District, civil RICO case); *Boyd*, 2008-Ohio-1229, ¶39 (Sixth District); *Ramminger,* 2007-Ohio-3306, ¶20 (First District, civil RICO case); *Flanagan v. Eden*, Cuyahoga App. No. 85252, 2005-Ohio-3133, ¶14 (Eighth District, civil RICO case); *State v. Johnson*, Wyandot App. No. 16-03-09, 2004-Ohio-1513, ¶23 (Third District); and *Teasley*, 2002-Ohio-2333, ¶53. But see, *State v. Wilson* (1996), 113 Ohio App.3d 737 (Ninth District).[5]

{¶ 94} In several cases decided after *Zorn* and *Owen*, we applied *Turkette's* evaluation of the existence of an "enterprise" in determining if the defendant's conviction for engaging in a pattern of corrupt activity was established by sufficient evidence. See *State v. Humphrey*, Clark App. No. 02CA0025, 2003-Ohio-2825, ¶34; *State v. Humphrey*, Clark App. No. 2002 CA 30, 2003-Ohio-3401, ¶41(separate appeals involving cousins and co-defendants involved in the same criminal "enterprise"); and *State v. Fritz*, 178 Ohio App.3d 65, 2008-Ohio-4389. In fact, in the latter *Humphrey* decision, we specifically cited *Turkette*, noting that the evidence indicated the existence of an ongoing organization that functioned as a continuing unit. 2003-Ohio-3401, at ¶41. Subsequently, in *Fritz*, we cited *Owen*, and noted that we had previously " 'resolved cases questioning the existence of an enterprise under the corrupt

---

[5]The Ninth District Court of Appeals has taken inconsistent positions. Prior to the *Wilson* decision, the Ninth District had applied *Turkette's* definition of an association-in-fact as having been demonstrated by an ongoing organization that is formal or informal, and by evidence that the associates function as a continuing unit. See *State v. Davis* (July 19, 1995), Lorain App. No. 94CA005964. In yet another example of inconsistency, the Eleventh District Court of Appeals took a position in *Theisler* that differs from its prior decision in *State v. Elersic*, Lake App. Nos. 2000-L-062, 2000-L-164, 2001-Ohio-8787, which indicated that Ohio had not adopted the federal approach requiring an enterprise to have an existence separate from the corrupt activity.

activity statute without reference to the federal requirements.' " 2008-Ohio-4389, at ¶48. Despite having made this statement, we did use the federal requirements in *Fritz*, when we held that the evidence established the existence of an enterprise, because it showed that the defendants had associated in an ongoing organization with a decision-maker and supplier, and a seller, and had also functioned as a continuing unit. Id. at ¶51.

{¶ 95} In 2009, in *Boyle,* supra, the United States Supreme Court returned to the topic, to consider "whether an association-in-fact enterprise must have 'an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages.' " 129 U.S. at 2244. The district court had refused an instruction that the government must establish that the enterprise " 'had an ongoing organization, a core membership that functioned as a continuing unit, and an ascertainable structural hierarchy distinct from the charged predicate acts.' " Id. at 2242. (Citation omitted.)

{¶ 96} The Supreme Court separated its inquiry into three parts – whether the association must have a structure; whether the structure must be "ascertainable"; and whether the structure must go beyond what is inherent in the pattern of racketeering activity in which its members engage. Id. at 2244. The Court first concluded that an association must have at least three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purposes." Id. Next, the Court held that the word "ascertainable" was redundant and potentially misleading, because each element of any crime must be "ascertainable" in order for the jury to find that the element has been proven beyond a reasonable doubt. Id.

{¶ 97} Regarding the last part of the inquiry, the Supreme Court reiterated its holding

in *Turkette* that "the existence of an enterprise is a separate element that must be proved." Id. The Court stressed, as it had in *Turkette*, that "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.' " Id. at 2245, quoting *Turkette*, 452 U.S. at 583.

{¶ 98} The Court did reject the petitioner's argument that an association-in-fact enterprise must have structural attributes like a structural hierarchy, chain of command, membership dues, an internal discipline mechanism, and so forth. In this regard, the Court stated that:

{¶ 99} "We see no basis in the language of RICO for the structural requirements that petitioner asks us to recognize. As we said in *Turkette*, an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods – by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." Id. at 2245-46.

**{¶ 100}** Based on its discussion, the Supreme Court concluded that the district court did not err in refusing the requested jury instructions, and had adequately instructed the jury about the elements of an enterprise, because the instructions made clear that the existence of an enterprise was a "separate element from the pattern of racketeering activity." Id. at 2247. The Court also stressed that the jury had been instructed that the government "was required to prove that there was 'an ongoing organization with some sort of framework, formal or informal, for carrying out its objectives' and that 'the various members and associates of the association function[ed] as a continuing unit to achieve a common purpose.' " Id. (Brackets in original; citation omitted.)

**{¶ 101}** After *Boyle* was decided, we considered whether a defendant could be found guilty of engaging in a pattern of corrupt activity under R.C. § 2923.32 where the undisputed evidence at trial indicated that the defendant was the president and owner of a corporation. The defendant argued that he could not be found guilty of "forming an enterprise when he was merely associating with himself." *State v. Clayton*, Montgomery App. No. 22937, 2009-Ohio-7040, ¶40. We rejected this argument. First, we relied on the decision of the Eighth District Court of Appeals in *U.S. Demolition & Contracting,* supra. Id. at ¶43. We noted that the court in *U.S. Demolition & Contracting* had "pointed out that '[the Ohio pattern of corrupt activity statutes] are patterned after the Racketeering Influenced and Corrupt Organizations Act ("RICO"), Section 1961 et seq., Title 18, U.S.Code.* * * In applying [the Ohio pattern of corrupt activity statutes], Ohio courts look to federal case law applying RICO.' " Id., quoting from *U.S. Demolition & Contracting*, 94 Ohio App.3d 75, 83. (Brackets in original.)

{¶ 102} In *Clayton*, we then relied specifically on the decision of the United States Supreme Court in *Cedric Kushner Promotions, Ltd. v. King* (2001), 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198.   We noted that in *King*:

{¶ 103} "[T]he U.S. Supreme Court applied RICO and specifically addressed the argument presently advanced by Clayton.  In *King*, the plaintiff alleged that the defendant violated RICO statutes by engaging in a pattern of corrupt activity in the conduct of his business. The defendant maintained that he could not be a 'person' operating a separate 'enterprise' because he was the president and sole shareholder of his closely held corporation.  The U.S. Supreme Court held that the requisite distinctness between the defendant and his corporation was sufficient to establish that they were legally distinct entities, thus that the defendant, as the sole shareholder/officer/employee was the 'person,' and his corporation was the 'enterprise.'

{¶ 104} "Similar to the defendant in *King*, Clayton was the president and owner of ELTA.  In that role, Clayton was the separate and distinct 'person,' while the ELTA was the 'enterprise' that he acted through when he engaged in a pattern of corrupt activity, to wit; aggravated theft and money laundering.  Thus, the State adduced sufficient evidence to convict Clayton of engaging in a pattern of corrupt activity."  2009-Ohio-7040 at ¶44-45.

{¶ 105} In light of the preceding discussion, we agree with Franklin that the trial court should have instructed the jury, consistent with the federal law on "enterprise" outlined in *Turkette* and *Boyle*.  We have never specifically rejected the application of federal law, and, in fact, have both impliedly and expressly applied federal law to Ohio RICO cases when deciding questions of sufficiency of the evidence.

{¶ 106} As we noted, the Supreme Court of Ohio has said that "it is prejudicial error in a criminal case to refuse to administer a requested charge which is pertinent to the case, states the law correctly, and is not covered by the general charge." *Scott*, 26 Ohio St.3d 92, 101. The definitions outlined in *Turkette* and *Boyle* are pertinent, and state the law correctly. They are also not covered by the general charge, which contained only the statutory definition of enterprise. Although there is evidence in the record that could support a finding of an enterprise, the jury was not properly instructed on the point.

{¶ 107} Franklin's Third Assignment of Error is sustained in part. The conviction for Engaging in a Pattern of Corrupt Activity will be reversed and this cause will be remanded for further proceedings.

V

{¶ 108} Franklin's Fourth Assignment of Error is as follows:

{¶ 109} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DEMONSTRATED A PERMEATING OVERT BIAS TOWARD APPELLANT AND HIS TRIAL COUNSEL THROUGHOUT THE TRIAL, DEPRIVING APPELLANT OF HIS RIGHT TO A FAIR TRIAL."

{¶ 110} Under this assignment of error, Franklin contends that the trial court demonstrated bias against him and his counsel at several points during the trial, and deprived Franklin of the right to a fair trial. Franklin points to the trial court's alleged attempt to rehabilitate a State witness by questioning the witness as to his conclusions before the State had a chance to do so on redirect examination; the court's comments during discussion of a substitution of counsel motion filed by Franklin's co-defendant; alleged disparaging remarks

made to Franklin's counsel during discussion of a speedy trial motion; and the court's frustration with Franklin's counsel for not having been readily available when the jury returned its verdict.

{¶ 111} " 'In a trial before a jury, the court's participation by questioning or comment must be scrupulously limited, lest the court, consciously or unconsciously, indicate to the jury its opinion on the evidence or on the credibility of a witness.' *State ex rel. Wise v. Chand* (1970), 21 Ohio St.2d 113, 119, 50 O.O.2d 322, 325, 256 N.E.2d 613, 617 * * *.

{¶ 112} "In order to determine whether a trial court's remarks are prejudicial, the Supreme Court of Ohio has set forth the following guidelines:

{¶ 113} " '(1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, (4) consideration is to be given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.' *State v. Wade* (1978), 53 Ohio St.2d 182, 188, 7 O.O.3d 362, 365, 373 N.E.2d 1244, 1248." *State v. Hopfer* (1996), 112 Ohio App.3d 521, 537. (Citations omitted.)

{¶ 114} Upon reviewing the record regarding the trial court's questioning of Gary Schaffer, a forensic chemist at the Miami Valley Regional Crime Lab, we conclude that Franklin has failed to sustain the burden of proving that the court's remarks were prejudicial. The court was merely trying to clarify the testimony. In addition, Franklin did not object at the time. In fact, Franklin did not mention the matter until after the jury had returned from a lunch break and another witness was to be presented. At that time, Franklin's counsel

mentioned the court "taking over the cross-examination of a witness" and simply  asked the court to instruct the jury at the end of the day that if the court had done anything to indicate that it favored one side or the other, that was not correct.   Trial Transcript, pp. 1065-66.   The trial court did give the jury such an instruction at the end of that day.   Id. at   p. 1217.

{¶ 115} Regarding the trial judge's alleged bias, we note that Franklin filed a motion for disqualification with the Supreme Court of Ohio in November 2009.   Among other things, the motion contended that the trial judge intended to use the threat of criminal sanctions against another defendant on Judge Wagner's docket, Monique Pope, in order to get Pope to testify against Franklin, with whom she was romantically involved.   The motion also alleged that the trial judge was communicating ex parte with the State's attorneys, and that the judge had continued Franklin's case in order to give the State time to file additional charges. The Supreme Court of Ohio denied the motion for disqualification in December 2009, finding it without merit. The court concluded that Franklin had presented no evidence of bias; merely subjective belief.

{¶ 116} In *State v. Dean*, 127 Ohio St.3d 140,   2010-Ohio-5070, the Supreme Court of Ohio noted that:

{¶ 117} " '[A] criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law.' * * * Judicial bias has been described as 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts.' " Id. at ¶48. (Citations omitted.)

{¶ 118} With respect to judicial bias, the Supreme Court of Ohio further observed that:

{¶ 119} "In *Liteky v. United States* (1994), 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474, the Supreme Court held that 'opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.' On the other hand, '[t]hey *may* do so [support a bias challenge] if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.' " Id. at ¶49. (Bracketed material and italics in original.)

{¶ 120} At trial, three incidents occurred out of the presence of the jury, which Franklin alleges show bias on the part of the trial court. One involved a discussion during which the trial court mistakenly concluded that a member of Franklin's counsel's family had notarized an affidavit for Franklin's co-defendant. Upon being advised of this mistake, the trial court apologized to counsel. The second instance involved the trial court's reference to Franklin's counsel as a "shotgun kind of lawyer." We do not find the trial court's characterization of counsel's comprehensive advocacy of his clients' interests to have been disapproving or disparaging.

{¶ 121} During a third incident the trial court expressed frustration when Franklin's counsel was not available in a timely fashion to hear the jury verdict. However, the trial

court did wait for Franklin's counsel and took no action against him. The irritation expressed by the trial court, out of the presence of the jury, because lead defense counsel was not initially present when the jury announced it had returned a verdict did not amount to overt bias toward defendant, and could not, in any event, have prejudiced the jury, since the jury was not thereafter in the presence of the trial court until its verdict, which had been reduced to writing, was read in open court

{¶ 122} We have reviewed the entire transcript and find no evidence of improper bias or improper conduct on the trial court's part. In fact, the court went out of its way during the trial to accommodate Franklin's counsel with respect to making a record on the *Batson* issue.

{¶ 123} Franklin's Fourth Assignment of Error is overruled.

VI

{¶ 124} Franklin's Fifth Assignment of Error is as follows:

{¶ 125} "THE TRIAL COURT PREJUDICIALLY ERRED WHEN IT ADMITTED INTO EVIDENCE ITEMS THAT HAD NO PROBATIVE VALUE AND THAT UNDULY PREJUDICED APPELLANT."

{¶ 126} Under this assignment of error, Franklin contends that the trial court erred in allowing the State to present evidence of a photograph of a DVD case, as well as the actual DVD case, which was entitled: "Never Get Busted Again." The DVD case, along with a baggie of heroin, was recovered from a car in which Franklin and Pope were riding on January 26, 2009. Franklin maintains that the evidence was not relevant and was unduly prejudicial.

{¶ 127} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Haines*, 112 Ohio St.3d 393, 2006-Ohio-6711, ¶50.

Therefore, we review the decision for an abuse of discretion, which means that the trial court must have acted arbitrarily, unreasonably or unconscionably. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161.

{¶ 128} It was the State's burden to prove the existence of an ongoing organization, with associates that function as a continuing unit, which engages in criminal activity. The title of the DVD suggests that its possessor may have committed past criminal acts and desires to commit further criminal acts without being apprehended. To the extent that other evidence proved an ongoing organization and Franklin's association with it, the title of the DVD was relevant to prove that the organization engages in criminal activity. Being relevant for that purpose, the DVD was admissible. Evid. R. 402. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

{¶ 129} Franklin's Fifth Assignment of Error is overruled.

VII

{¶ 130} Franklin's Sixth Assignment of Error is as follows:

{¶ 131} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO DECLARE A MISTRIAL AFTER REPEATED ACTS OF PROSECUTORIAL MISCONDUCT DURING THE TRIAL DEPRIVED APPELLANT OF HIS RIGHT TO A FAIR TRIAL."

{¶ 132} Under this assignment of error, Franklin contends that the prosecution committed misconduct by repeatedly showing the jury a cardboard poster that labeled Franklin and his co-defendant as part of a "drug-trafficking group."

{¶ 133} "The test for prosecutorial misconduct is whether remarks were improper and,

if so, whether they prejudicially affected substantial rights of the accused. * * * The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Jones,* 90 Ohio St.3d 403, 420, 2000-Ohio-187. (Citations omitted.) Our review of the record fails to disclose prosecutorial misconduct. The trial was also not unfair.

{¶ 134} The defense originally objected to the poster before opening statements, and the State explained that the poster was being used for demonstrative purposes, to help the jury keep track of the incidents. The trial court overruled the objection, and said it would caution the jury that the poster was not evidence. The trial court then instructed the jury on that point. See Trial Transcript, pp. 279-81.

{¶ 135} On the second day of trial, Franklin's counsel again objected to the poster being displayed to the jury when not in use. At this time, the State said the poster had faced backwards the previous day, and noted that if the jury had seen the front of the poster, it would have been accidental and brief. The court again stated that the State could use the poster, but instructed the State to hide the poster when it was not being used. Id. at 353-54. After this discussion occurred, the court raised the matter on its own accord, and cautioned the State not to overly use the poster. Id. at 492-96. During this discussion, the State offered to delete the words "drug-trafficking group" from the exhibit.[6]

{¶ 136} The State once more asked the court for clarification on when it could use the poster, and the court told the State that it could use the poster for the moment being talked about, but then to take it down. Id. at pp. 501-02. The remaining part of the record does not indicate that the State repeatedly used the poster, nor does it indicate that any misuse occurred.

---

[6] The State's comments are listed as "inaudible" at p. 494 of the transcript, but the audiovisual record of the proceedings indicates

{¶ 137} Franklin's Sixth Assignment of Error is overruled.

VIII

{¶ 138} Franklin's Seventh Assignment of Error is as follows:

{¶ 139} "THE JOINDER OF APPELLANT'S CASE WITH CO-DEFENDANT DE'ARGO GRIFFIN'S CASE VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL, A RIGHT GUARANTEED BY THE UNITED STATES CONSTITUTION."

{¶ 140} Franklin argues under this assignment of error that the joinder of his case with Griffin's case violated his due process right to a fair trial. In this regard, Franklin contends that the case concerns offenses committed on multiple dates, including two incidents in which Franklin was not even alleged to have been involved. Franklin also claims that confusion existed on the part of the trial court and jury.

{¶ 141} Crim. R. 8(A) provides that:

{¶ 142} "Two or more defendants may be charged in the same indictment, information or complaint if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses, or in the same course of criminal conduct. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count."

{¶ 143} R.C. 2945.13 additionally states that:

{¶ 144} "When two or more persons are jointly indicted for a felony, except a capital offense, they shall be tried jointly unless the court, for good cause shown on application

---

that the State offered to delete the term from the exhibit.    See audiovisual record, Day 2, at 1:49:13-20.

therefor by the prosecuting attorney or one or more of said defendants, orders one or more of said defendants to be tried separately."

{¶ 145} The Supreme Court of Ohio has stressed that "[j]oinder of offenses is favored because it conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries." *State v. Hamblin* (1988), 37 Ohio St.3d 153, 158. In *Hamblin*, the court concluded that joinder was proper, because the offenses were "part of a continuing course of criminal conduct." Id.

{¶ 146} "A defendant claiming error in the trial court's refusal to allow separate trials * * * has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial." *State v. Torres* (1981), 66 Ohio St.2d 340, syllabus. Accord *State v. Ramey*, Clark App. No. 2010 CA 19, 2011-Ohio-1288, ¶59.

{¶ 147} In the case before us, Franklin and Griffin were alleged to have been involved in a pattern of corrupt activity, which would necessarily have involved their participation in an ongoing organization with associates that function as a continuing unit. The testimony at trial involved eight incidents of drug possession or trafficking. Franklin was involved in four incidents where Griffin was not present; Griffin was involved in two incidents where Franklin was not present; and they were involved together in two incidents. However, the incidents in which the two were separately involved had overlapping participants. For example, Foster

was involved with Franklin in an incident in July 2007, and in an incident with Griffin in March 2009. Foster was also present during incidents that involved both Griffin and Franklin in January and March 2009.

{¶ 148} Although the time frames in the case before us are not as close together as those in *Hamblin*, the incidents involving Franklin and Foster are intertwined and are alleged to have been part of the pattern of corrupt activity necessary to prove a violation of R.C. 2923.32. If Franklin and Griffin had been tried separately, the State would have been required to present the same evidence in each trial to prove the violation.

{¶ 149} Furthermore, we see no evidence of confusion in the record. Franklin cites to a transcript not in evidence in this appeal, in which the trial court allegedly said that the jury was confused. See Franklin Brief, pp. 30-31, referring to p. 766 of the Griffin transcript, which according to Franklin, equates with p. 1105 of the transcript filed in this appeal. Even if a remark about confusion had been made, it is clear from the context that the issue involved whether Griffin had been charged with a crime arising from an incident involving Foster and Griffin. Specifically, the jury had asked why Foster was charged and Griffin was not charged. After discussing the jury's question, the court concluded that the question was not relevant, and declined to answer it. This was consistent with the State's position throughout trial that even if Griffin or Franklin had not previously been indicted for possession of an illegal substance or with trafficking for a particular incident, the State could use those instances as predicate acts to show a pattern of corrupt activity. See Trial Transcript, pp. 652-655. The trial court agreed with the State.

{¶ 150} Furthermore, we find it irrelevant that the trial court inadvertently referred to Griffin as Anthony Griffin while giving jury instructions. The court immediately realized and corrected this one-time error. Id. at p. 1181.

{¶ 151} Franklin's Seventh Assignment of Error is overruled.

IX

{¶ 152} Franklin's Eighth and Ninth Assignments of Error are as follows:

{¶ 153} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY THE COMBINATION OF ALL OF THE ERRORS IT COMMITTED IN THIS CASE, I.E., THE CUMULATIVE EFFECT OF ALL OF THE ERRORS DEPRIVED APPELLANT OF HIS RIGHT TO A FAIR TRIAL.

{¶ 154} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ANY OTHER ERRORS THAT ARE NOT SET FORTH IN THE FOREGOING THAT CAN NONETHELESS BE FOUND IN THE RECORD OF THIS CASE."

{¶ 155} Franklin does not present any argument under these assignments of error. " Where no individual, prejudicial error has been shown, there can be no cumulative error." *State v. Jones*, Montgomery App. No. 20349, 2005-Ohio-1208, ¶66, citing *State v. Blankenship* (1995), 102 Ohio App.3d 534, 557. Because we have found only one instance of error in instructing the jury, we cannot find cumulative error. "There are no multiple errors to cumulate." Id. We also decline the invitation to search the record for additional errors.

{¶ 156} Franklin's Eighth and Ninth Assignments of Error are overruled.

X

**{¶ 157}** All of Franklin's assignments of error having been overruled, with the exception of Franklin's Third Assignment of Error, which is sustained in part, Franklin's conviction for Engaging in a Pattern of Corrupt Activity is Reversed, the judgment of the trial court is Affirmed in all other respects, and this cause is Remanded for further proceedings consistent with this opinion.

. . . . . . . . . . . . .


GRADY, P.J., and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck
Kirsten A. Brandt
Daniel J. O'Brien
Hon. Steven K. Dankof